IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,
                    Plaintiff,

                                        Criminal Action
          vs                            No. 20-7-12

BRIAN GIDNEY,
                    Defendant.

_____


          Transcript of Detention proceedings held on Friday,
June 19, 2020, United States District Court, Johnstown,
Pennsylvania, before the Honorable Keith A. Pesto, U.S.
District Court Magistrate Judge.


APPEARANCES:

For the Government:          MAUREEN SHEEHAN-BALCHON, Esq.
                            United States Attorney's Office
                            319 Washington Street
                            Johnstown, PA  15901
                            Maureen.Sheehan-Balchon@usdoj.gov


For the Defendant:           KOMRON J. MAKNOON, Esq.
                            Maknoon & Associates
                            309 Smithfield Street, 4th Floor
                            Pittsburgh, PA  15222
                            kjm@maknoon-law.com



Court Reporter:     Shirley Hall, RDR, CRR
                    U.S. Courthouse, Suite 204
                    208 Penn Traffic Building
                    319 Washington Street
                    Johnstown, PA  15901
                    shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

(In open court and via Zoom.)

THE COURT:  Let's go on the record.  It's a couple minutes before 3:30 p.m. on Friday afternoon, June 19th, 2020.  I'm here in Courtroom A in Johnstown for the arraignment and detention hearing in the <u>United States versus Brian Gidney</u>, Criminal No. 20-7.

The Government is present in the courtroom with me and also the court reporter and the courtroom deputy.  The Government is represented by Attorney Sheehan-Balchon.  Attorney Maknoon appears by Zoom on behalf of Mr. Gidney, who also appears by Zoom from the Cambria County prison.  We also have two witnesses, Agent Isber and Ms. Welker.  Each side has a proposed witness for the detention hearing portion of this proceeding.

The first order of business, Attorney Maknoon, if I could get your formal consent to hold this proceeding by Zoom.  It's the only game in town now, but I've been asked to make sure that everybody does consent in fact to holding the proceeding by Zoom.

MR. MAKNOON:  Yes, Your Honor; I consent to holding the meeting by Zoom.

THE COURT:  Thank you.

Mr. Gidney, at the previous -- or our previous meeting at the initial appearance I advised you of your right to

1    counsel, and counsel has appeared on your behalf.

2    Attorney Maknoon is the person who's really carrying the ball

3    at this point.

4              So let me ask, Attorney Maknoon, have you had enough

5    time to go over the indictment with your client for purposes of

6    entering a plea today?

7              MR. MAKNOON:  Yes, I have, Your Honor.  I spoke with

8    him a few days ago.  We were somewhat limited, but I have seen

9    the indictment.  I believe that he has seen the indictment

10   also, but I cannot confirm that.

11             THE COURT:  He received a redacted copy and was able

12   to look at it for a little while.  It was still under seal at

13   that point, but at the initial appearance he received a copy of

14   the indictment as it pertained to him.

15             I can read the portions of the indictment that pertain

16   to him if you want.

17             MR. MAKNOON:  I don't think that would be necessary,

18   Your Honor.

19             THE COURT:  Okay.

20             MR. MAKNOON:  I believe that we have -- we've had

21   enough of a conversation and understanding to enter his plea of

22   not guilty and proceed.

23             THE COURT:  Very well.  Do you want a trial by jury or

24   by judge?

25             MR. MAKNOON:  By a jury, Your Honor.

1          THE COURT:  Jury, okay.

2          At this point I know there's a protective order and I

3    have to make a ruling on some objections to that protective

4    order that have been filed by some of counsel, so I know that

5    discovery has not yet been completed and Rule 16 conferences

6    have not been held.  I think since we don't even have all the

7    people under indictment in the district at this point, we have

8    not yet scheduled the matter for trial; and I can't really say

9    how long it would be until we know who's going to trial and on

10   what charges.

11         So, with that string of nullities, let's go on to the

12   question of detention versus release.  The Government moved for

13   detention; a detention hearing has been scheduled.  I've

14   reviewed a Pretrial Services report which recommends release on

15   conditions.

16         Both of counsel have proposed witnesses today.  So if

17   I found the Pretrial Services report to rebut the presumption

18   that there are no conditions of release, can the Government

19   proceed by proffer or by witness as to what it would intend to

20   introduce at evidence?

21         MS. SHEEHAN-BALCHON:  Your Honor, I'd actually like to

22   present a hybrid, some by proffer, some by witness, if that's

23   acceptable.

24         THE COURT:  As you wish, sure.

25         MS. SHEEHAN-BALCHON:  So, Your Honor, the proffer as

to offense conduct as it relates to Mr. Gidney, as the Court's aware -- and I understand this is Mr. Maknoon's first hearing in this matter -- this was an extensive wiretap investigation that spanned over eight months with one of the primary targets being an Alexis Brolin.  That individual was a direct supplier to Mr. Gidney.

Mr. Gidney was intercepted on multiple occasions and acted as a re-distributor of methamphetamine with Mr. Brolin. On at least ten distinct transactions that were confirmed by investigators between Mr. Gidney and Mr. Brolin, three of those alone, Your Honor, constituted approximately 13 ounces of methamphetamine that was transacted between Mr. Gidney and Mr. Brolin with Mr. Gidney then redistributing those, that amount of methamphetamine.  Based upon these seven other transactions, a higher amount will be proven at trial.

The weight of the evidence, the second prong of this, Your Honor, is quite substantial.  As I indicated, it was a wiretap investigation wherein Mr. Gidney was not only intercepted, but identified by physical surveillance, some occasions by video surveillance of other members of the organization.

The history and characteristics of this particular Defendant, Your Honor, while his criminal history is not as significant as some of the members of the organization, he has at least five arrests, four convictions, two convictions for

1   DUI, and most importantly, Your Honor, six bench warrants for

2   failures to appear have been issued for Mr. Gidney during his

3   involvement in the criminal justice system and including -- I'm

4   sorry -- and in addition one probation violation that

5   Mr. Gidney was cited for.

6           During the course of the investigation, Your Honor,

7   there were interceptions made of Mr. Gidney that demonstrated

8   to investigators his proclivity towards violence.  And

9   specifically, Your Honor, at the end of the interceptions of

10   Mr. Brolin, approximately April 4th of 2020, there were

11   particularly concerning communications from Mr. Gidney to

12   Mr. Brolin that caused investigators to interdict Mr. Brolin so

13   that he did not return to Clearfield County and face the

14   threats of violence by Mr. Gidney.

15           Specifically, Your Honor, the -- either the previous

16   day, on April 3rd, or early on April 4th Mr. Gidney supplied

17   approximately $3,000 to Mr. Brolin.  Mr. Brolin traveled to

18   Erie, Pennsylvania, with that money and with additional monies

19   that he had collected from re-distributors.  By the 4th of

20   April, when he had not returned, at approximately five in the

21   afternoon Mr. Gidney began threatening Mr. Brolin;

22   specifically -- and I would note, Your Honor, these transcripts

23   have been provided to Mr. Maknoon.

24           Specifically, Mr. Gidney indicated to Mr. Brolin:

25   Hey, not joking, Dude.  If you don't have my fucking money or

product, it's over for you and I'm serious.  I will have
everybody I know looking for you and Mike -- as a side note,
Your Honor, Mr. Bisbee was referred to as Mike.  Mike is the
guy you're with.  Tell him he's in just as much shit.  Everyone
you're with will get fucked up, and I guess I don't F'ing care
anymore.

Following that, when he didn't get a response from
Mr. Brolin, he repeated the same threat, indicating that:  It's
over for you.  I'm serious.  I have everybody I know looking
for you.  And Mike is in just as much trouble.

Following that, the final threat that evening,
Your Honor, Mr. Gidney indicated to Mr. Brolin:  No games.  If
you're thinking it is, you're going to find out, Dude -- or:
You'll find out, Dude.

So following those interceptions, Your Honor, the
state police interdicted Mr. Brolin partially for his safety,
partially to interdict the drug load was that coming back to
Clearfield; and they recovered at least two pounds of
methamphetamine from Mr. Brolin.  He was arrested, lodged in
the Erie County jail for his own safety.

That's the extent of the proffered information,
Your Honor; and at this time I would call ATF Agent
William Isber.

MR. MAKNOON:  If I could just interject briefly,
Your Honor.

1              THE COURT:  Sure.

2              MR. MAKNOON:  With regards to the proffer, if the

3     agent -- my question would be:  Will the agent be able to

4     respond to questions on cross regarding what has just been

5     proffered?

6              MS. SHEEHAN-BALCHON:  This agent is going to testify,

7     Your Honor, exclusively to the execution of a search warrant at

8     Mr. Gidney's residence on June 9th of 2020 and what evidence

9     was seized there.

10             THE COURT:  Okay.  All right.

11             Attorney Maknoon, let me anticipate the issue because

12    this has arisen earlier today in connection with a similar

13    proceeding where there was a proffer and a challenge to the

14    proffer.

15             The objection that previous counsel had, which I

16    presume is similar to what you would argue, is that you can't

17    cross examine a proffer; how can you defeat that?  My ruling in

18    the previous case and, if I understand the thrust of your

19    inquiry that you would make a similar objection, is that the

20    Government will be making the foundation for the proffer

21    available to you as discovery proceeds.

22             If the Government were to proffer something that is

23    not accurate or is contradicted by the discovery proceedings,

24    the case blows up.  So you can't cross examine the proffer, but

25    the Government's entire credibility is behind that proffer.

And that has been in my experience something that I can rely
on.  So with that explanation as to how I dealt with this
earlier today, I presume you're objecting to my relying on the
proffer.

MR. MAKNOON:  Yes.  And I will just -- I will just
respectfully add to my objection obviously I understand the
Government is not going to provide bad information which their
case hinges on in their proffer.  But to give an example of a
follow-up question, it would be that Mr. Brolin was
incarcerated for his safety and because he was returning with
drugs, based upon the situation of my client making threats.

An example, some questions that would have been if
someone had more knowledge for cross examination would be:  Did
my client take any proactive steps towards pursuing Mr. Bisbee
or less?  Things of that nature.  Not to say that the
Government's proffer is incorrect; it would be something to
clarify that would be relevant to danger to the community or
others.

THE COURT:  All right.

MR. MAKNOON:  And the second part would be 3142 of the
Bail Reform Act does give the Defendant the ability to proffer;
I don't know if it specifically gives it to the Government.
And that would be it.

THE COURT:  Thank you.  I -- the legal objection is --
that's a good one.  I hadn't -- I haven't researched that in

1    quite a while.  If you wish to make a proffer as well, I will

2    certainly -- I will hear that.  As far as what the Government

3    proffered and what the Government didn't proffer, if the

4    Government didn't proffer it, I won't consider it.

5            So I take the Government's proffer for what it did not

6    say as much as it did.  There is no evidence that there's

7    anything other than the intercepts that were proffered.  There

8    is no evidence that there was an overt act that would have

9    constituted a step towards the completion of a threat, and I

10   won't be relying on that.

11           All right.

12           MR. MAKNOON:  Thank you, Your Honor.

13           THE COURT:  With that said, your witness, Miss Welker,

14   is a proposed third party custodian?

15           MR. MAKNOON:  Yes, Your Honor.

16           THE COURT:  And do you wish to put her testimony on

17   the record?

18           MR. MAKNOON:  Yes, Your Honor, I can.  I can give the

19   first proffer.

20           THE COURT:  All right.  Well, let me -- well --

21           MR. MAKNOON:  Oh, I'm sorry.

22           THE COURT:  Before you do, I think since we have two

23   witnesses who are going to testify, maybe we should swear them

24   both in at this time.

25           MR. MAKNOON:  Yes, thank you.

1          THE COURT:  All right.  If the witnesses would please

2     raise their right hands to be sworn.

3          WILLIAM ISBER and LEAH WELKER, witnesses herein,

4     having been first duly sworn, were examined and testified as

5     follows.

6          THE COURT:  Okay.  Now, let's -- just to go in order,

7     Attorney Sheehan-Balchon, your witness first.

8          MS. SHEEHAN-BALCHON:  Thank you, Your Honor.

9                         DIRECT EXAMINATION

10    BY MS. SHEEHAN-BALCHON:

11    Q    Agent, can you please state your full name.

12    A    Sure.  My name is William Isber.

13    Q    And where are you employed?

14    A    I'm employed by the Bureau of Alcohol, Tobacco and Firearms

15    and Explosives out of the Pittsburgh office.

16    Q    How long have you been employed in that capacity?

17    A    Approximately five years.

18    Q    And were you working in that capacity on June 9th of this

19    year?

20    A    I was.

21    Q    Were you assigned to assist in an arrest and subsequent

22    execution of a search warrant at 192 Old Camp Hill Road in

23    Mineral Springs in the Western District of Pennsylvania?

24    A    Yes.

25    Q    And were you there as well when evidence was collected

1   pursuant to the search warrant?

2   A    Yes.

3   Q    Were you there when Brian Gidney was taken into custody or

4   shortly after he had been taken into custody?

5   A    I was.

6   Q    Were there any other adults at that location when

7   Mr. Gidney was arrested?

8   A    Yes.

9   Q    Approximately how many?

10  A    Two other adults.

11  Q    And what was the nature of their visit, if you learned?

12  A    One -- one of the adults, a male, was there to borrow some

13  construction equipment, and we believe that the female was

14  there to purchase drugs.

15  Q    Okay.

16          MR. MAKNOON:  I would object to the speculation,

17  Your Honor.

18          THE COURT:  Objection sustained.  I won't rely on it.

19  You can lay a foundation for it, though.

20          MS. SHEEHAN-BALCHON:  We'll move on, Your Honor.

21  BY MS. SHEEHAN-BALCHON:

22  Q    Those two other individuals, did they claim to live at this

23  residence?

24  A    No.

25  Q    So to the best of your knowledge, who lived at the

1   residence?

2   A    Just Mr. Gidney.

3   Q    Okay.  Were there, in fact, amounts of methamphetamines

4   seized at the residence?

5   A    There were.

6   Q    Approximately how much?

7   A    Approximately a kilo, 698 grams.

8   Q    Okay.  And did you personally view the methamphetamine

9   and/or the photographs of the evidence?

10  A    Yes.

11  Q    Were any amounts of the methamphetamine already packaged

12  for resale amounts?

13  A    They were.

14  Q    Approximately how large of a package?

15  A    Approximately one-ounce packages.

16  Q    Okay.  Was there also --

17  A    Yes --

18  Q    I'm sorry.

19  A    Sorry.  Gram packages, one gram, yeah -- one ounce -- I'm

20  sorry, one-ounce packages, yes.

21  Q    Okay.  And was there approximately $3,500 in US currency

22  seized?

23  A    There was.

24  Q    Were there firearms seized?

25  A    Yes.

1  Q   Tell us if there were any firearms seized in direct

2  proximity to the methamphetamine that was packaged for resale.

3  A   Yes, there was one .45 caliber firearm that was directly

4  beneath the box that contained all of the prepackaged

5  methamphetamine.

6  Q   Was that .45 caliber loaded at the time that it was seized?

7  A   It was.

8  Q   All right.  And how many other firearms were seized?

9  A   Approximately -- I'd have to double check, about --

10 approximately ten.

11 Q   Okay.  And were there handguns, a revolver and rifles

12 seized in those eleven total?

13 A   Yes.  Yes.

14 Q   Were any of them semi-automatic?

15 A   Yes.

16 Q   Did any of the firearms have no hunting value, meaning it

17 was not -- they were not hunting rifles?

18 A   Yes, some of the firearms seized had very, very little

19 hunting value.

20 Q   Okay.  And was there also ammunition seized?

21 A   Yes.

22 Q   Okay.  Mr. Gidney admitted to Pretrial Services that he

23 owned eight firearms, but you've indicated here today that you

24 seized eleven.

25 A   That's correct.

1    Q    And in those seizures was there a .223 pistol seized?

2    A    No, there was not.

3    Q    And how many 7.62 rifles were seized?

4    A    One 7.62 rifle.

5    Q    Okay.  So if Mr. Gidney admitted to owning a .223 pistol

6    and two of the 7.62 rifles, there's at least two guns out there

7    that Mr. Gidney owns that you didn't seize.  Is that accurate?

8    A    That's correct.

9    Q    Okay.

10   A    That is accurate.

11   Q    Agent, can you tell us if there was any -- any indication

12   or indicia of consumption of methamphetamine found at

13   Mr. Gidney's residence.

14   A    There was.

15   Q    Okay.  And --

16   A    There was -- I'm sorry.

17   Q    And generally describe --

18   A    I'm sorry.

19   Q    Go ahead, I'm sorry.

20   A    Generally describe what we saw or --

21   Q    Sure.

22   A    Okay.  On the dining room table there were several pipes

23   and other drug paraphernalia along with scales and residue from

24   methamphetamine.

25   Q    Okay.  To the best of your knowledge is somebody that's

1   addicted to controlled substances permitted to purchase or have

2   firearms?

3   A   They are not permitted to purchase or own firearms.

4   Q   Okay.

5           MS. SHEEHAN-BALCHON:  I would offer the witness for

6   cross examination, Your Honor.

7           THE COURT:  Your witness, Attorney Maknoon.

8           MR. MAKNOON:  Thank you, Your Honor.

9                           CROSS EXAMINATION

10  BY MR. MAKNOON:

11  Q   Agent Isber, how are you?

12  A   I'll well, sir.  How are you?

13  Q   Good.  Somewhat brief, this -- this place for the search

14  warrant was in Mineral Springs, is that right?

15  A   Yes, sir.

16  Q   How would you describe that area?  Lake rural, almost like

17  a hunting camp?

18  A   Extremely rural.

19  Q   Okay.  And how would you describe this?  Is this like a

20  one-room shack or is it a multi bedroom?

21  A   I would say it's -- it was one bedroom, multiple rooms

22  though.

23  Q   Okay.  And in a wooded area.

24  A   Correct.

25  Q   Would you describe it as like a hunting cabin or just a

1   very rural --

2   A   I would just say rural.

3   Q   Okay.  Some of those guns you said wouldn't be good for

4   hunting.  Give me an example, please.

5   A   A nine -- a 9-millimeter with an AR platform setup.

6   Q   Okay.

7   A   And I would have to reference as to make and model.

8   Q   Okay.  So that's the one that comes to your mind?

9   A   That's the one that jumps out; yes, sir.

10  Q   And it's fair to say aside from hunting there's also, you

11  know, sporting with firearms as far as target practicing and

12  things of that nature; correct?

13  A   Sure.

14  Q   Okay.  And that wouldn't be unusual to just shoot something

15  like that at a target, so to speak.

16  A   No.

17  Q   Okay.  You mentioned the other people didn't claim that

18  they lived there.  Did -- but do you recall if they were asked

19  where they lived?

20  A   I do not recall.  I don't know that.  I don't know that

21  answer.

22  Q   Okay.

23          MR. MAKNOON:  That's all I have, Your Honor.

24          THE COURT:  Okay.  Any redirect?

25          MS. SHEEHAN-BALCHON:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  And if you wish to present

2     your witness, Attorney Maknoon, we'll go ahead and get that,

3     and then I'll hear argument.  Okay.

4          MR. MAKNOON:  Make my proffer, Your Honor?

5          THE COURT:  Sure.

6          MR. MAKNOON:  Yes, thank you.

7          As you see, there's a Leah Welker.  She would testify

8     her name is Leah Marie, M-A-R-I-E, Welker, W-E-L-K-E-R.  She's

9     born May 28th, 1984.  She lives at 1315 North Fifth Avenue,

10    Altoona, 16601.  She lives there with her two daughters which I

11    believe are about eight and nine years old.  Those are the

12    only -- the three of them live there.

13         She has been employed with UPMC Altoona in Altoona

14    since 2008.  She told me that it was -- or her proffer would be

15    that it was called Altoona Regional before it went to UPMC.

16         She has known my client for approximately 14 years.

17    They've been in a intimate relationship for approximately,

18    estimating, eight months to twelve months.  She would describe

19    his character as goodhearted, a kind person, helpful, and

20    caring.  She would acknowledge that he has a substance abuse

21    problem.

22         Let's see -- and I will add -- I will add to this,

23    Your Honor, that a few days ago I provided the information to

24    Eric Bossart.  I didn't see it on the -- on the presentence

25    report or the pretrial report.  I did follow up today because

1   when I spoke to Miss Welker I said:  Did anyone contact you?

2   And it was a no.  So I would say that that is -- it isn't

3   included in the report, but that the information has been

4   there.

5          I would also state that my client would testify that

6   she has nothing -- excuse me, Miss Welker would testify she has

7   nothing more on her history than a traffic ticket; and that she

8   is willing to report any and all infractions of whatever, you

9   know, would be done according to the conditions of release if

10  released.

11         THE COURT:  All right.

12         Miss Welker, I'm just curious.  You live down by

13  Penn Lincoln, is that correct?

14         MS. WELKER:  No, I live over on the campus side of

15  Altoona; Penn Lincoln is on the other side.

16         THE COURT:  Okay, so you're up in --

17         MS. WELKER:  Yeah, I live in --

18         THE COURT:  -- Juniata.

19         MS. WELKER:  -- the Juniata side.

20         THE COURT:  So everybody is on the same page, Altoona

21  proper swallowed up an independent borough called Juniata; and

22  so when you give a street address in Altoona, you might be

23  referring to the Juniata section which is at right angles to

24  the Altoona address.

25         So the address given is very close to the neighborhood

1    I lived in for a decade, but the Juniata Borough address that

2    was given is out by the Penn State Altoona campus.  I'm

3    familiar with the neighborhood.

4            You live in a much more upscale neighborhood than I

5    did, Miss Welker.  So I'm familiar with the area; and is that a

6    home that you own or rent?

7            MS. WELKER:  Yes, I own it.

8            THE COURT:  You own it, okay.  All right.

9            MS. WELKER:  Yes.

10           THE COURT:  All right.  Is there a cross examine from

11   the Government?

12           MS. SHEEHAN-BALCHON:  No, Your Honor, thank you.

13           THE COURT:  All right.

14           Anything else in light of my questions,

15   Attorney Maknoon?

16           MR. MAKNOON:  Nothing, Your Honor.

17           THE COURT:  All right.

18           Well, it appears to me that Pretrial Services has not

19   yet had a chance to check out all the particulars of the

20   proposed third party custodian; but assuming that it found the

21   third party custodian to be suitable and the Pretrial Services

22   report which recommends release anyway, could I hear argument

23   from counsel as to why or why not Mr. Gidney should be

24   released.

25           It doesn't matter to me who goes first or who goes

1   last.  Attorney Maknoon, do you want to go first?

2            MR. MAKNOON:  Thank you, Your Honor.

3            It's a presumption case, subject to rebuttal.  Some of

4   the information that Miss Welker would have testified to would

5   satisfy the 3142(g)(3)(A) factors that are relevant, which

6   comes down to his character -- I would actually say that

7   between the report that you have, Your Honor, and Miss Welker's

8   testimony, the two of those combined would cover, you know, a

9   significant amount of information to rebut.

10           My client's criminal history goes back quite some

11  time.  I mean -- and he has DUIs, so there's the two -- two

12  issues that would be focused on.  It would be risk of flight

13  and danger to the community or others.

14           Risk of flight I would acknowledge, absolutely, that

15  with a methamphetamine habit, which was admitted to -- and

16  there was obviously evidence testified to -- is a concern about

17  someone appearing to court.  But my client would be more than

18  willing to undergo inpatient treatment as directed by the

19  United States Probation, Pretrial, whichever inpatient program

20  it would be.

21           I would also acknowledge that the recommendation for

22  release with conditions occurred prior to us having a third

23  party custodian who -- and an offer of proof from me would be

24  that she is an extremely reliable, law-abiding, tax-paying,

25  employed, responsible person.  And I think that that would give

1    assurances to the Court that he would attend any hearing.

2         He's also hired a private attorney, which -- and I

3    don't know if there would be anything ex parte that could be

4    brought to your attention, but we do have a plan for how we

5    would like to proceed with my client.

6         The other factor as far as risk to the community or

7    danger to the community or others, I do think that it would be

8    much more relevant to stop Mr. -- I forget his last name --

9    Gohler on his way back to Erie with drugs because that's when

10   the wiretap would have caught him en route committing a crime

11   that has been listened to.

12        To say that it was due, you know, for his safety as

13   the paramount reason, sure, I'm sure there is some evidence for

14   that; but I don't think arguably that was the main reason he

15   was pulled over at that time.  I think that if the Government

16   did have additional evidence through wiretap or text of my

17   client orchestrating some hit to put on somebody, you know, it

18   would have been brought to our attention.

19        And correct me if I'm wrong, Bisbee and the other

20   individual of the -- on the receipt end of the text were the

21   kingpins, so to speak.  My client was, you know, not to the

22   level that they are in the indictment.  I would say it's

23   natural to say that if someone feels that they were being

24   ripped off, there's -- there could be a reaction.  But there is

25   nothing to show that the reaction -- anything was taken

1   advantage of.

2          Weight of the evidence is a factor for 3142.  The

3   Circuit Courts have said that weight of evidence is the least

4   important factor, and I defer to Your Honor on the proffers

5   made of the weight of the evidence.

6          And I would just look at my notes -- I would just in

7   conclusion say that with the recommendation and perhaps with my

8   client's stated criminal record and with somewhat of an

9   explanation of this threat that wasn't acted on and the third

10  party custodian, I believe that the Defendant has rebutted the

11  presumption.

12         THE COURT:  All right.

13         MS. SHEEHAN-BALCHON:  Your Honor, briefly I think that

14  the Government also has overcome that rebuttal.

15         This Defendant presents a volatile mix of

16  dangerousness, and I think the focus that we're asking the

17  Court to take is the snapshot that Mr. Gidney gave us the day

18  that he was arrested on June 9th, the snapshot into his life

19  and his behavior.  His house had a kilo of methamphetamine and

20  11 firearms, one which was directly with the drugs to protect

21  it.  And it was loaded and he was ready to go.

22         So it's our position that he is a danger to the

23  community and potentially to specific individuals.

24         THE COURT:  All right.  I've looked at the Pretrial

25  Services report and there is a criminal record, but I discount

1    that because it is dated.  And although -- I don't mean it's

2    not serious stuff, the offenses are misdemeanor/DUI sort of

3    offenses and not threats to the public safety like a drug case

4    would be, as the statute presumes.

5            The Pretrial Services report and the proffered

6    witness, who I think would be a credible third party custodian,

7    overcomes the presumption of release.  But on the balance, I

8    find him a danger to the community.

9            I don't think that there is a risk of flight.  I'm not

10   concerned about a risk of flight in this matter.  I think the

11   conditions could be crafted that would prevent a risk of

12   flight.  But I don't think in light of the offense conduct

13   that's proffered that I can have any assurance that the safety

14   of the public could be assured, no matter what condition I

15   imposed.

16           There is a -- whether it was rhetorical or in deadly

17   earnest and would have been acted on, I have no way of knowing.

18   So the threat to Mr. Brolin after the events of April 3rd, I

19   don't think that's dispositive.

20           It does concern me that there were ten incidents,

21   three of them multi-ounce incidents, in which Mr. Gidney was

22   a -- not just a user, but a re-distributor.  And although it's

23   closer to two-thirds of a kilo than a kilo, that's nothing to

24   sneeze at, that was found along with material indicating it was

25   being repackaged for re-distribution and not just personal

1   consumption.

2              Most crucially is the firearm in proximity to the

3   drugs.  Having 11 rifles or 11 semi-automatic weapons in the

4   house is not uncommon for this part of the world.  However, a

5   loaded weapon in close proximity to controlled substances is a

6   huge red flag to me.

7              So based on that, I am going to order Mr. Gidney

8   detained pending trial or such other time as new information

9   becomes available to either of counsel that under the statute

10  would constitute good cause for re-opening the question of

11  detention.

12             So that's my ruling.  I will get copies of the

13  paperwork on the docket as soon as we're done here.  And the

14  discovery in this matter would proceed just as soon as we have

15  a response -- well, just as soon as all of counsel have taken a

16  position on the question of the Government's protective order,

17  and I think that's something that will happen early next week.

18             Anything else from either of counsel at this time?

19             MS. SHEEHAN-BALCHON:  No, Your Honor.

20             THE COURT:  Nothing from the Government.  Anything

21  from --

22             MR. MAKNOON:  No.  Nothing, Your Honor.

23             THE COURT:  Thank you, Mr. Maknoon.  I will take a

24  look at the couple of legal points that you presented.  You

25  threw me a couple curves, and I better go double check my

1    reasoning; but thank you.

2         Mr. Gidney, you have a good, zealous attorney.  Please

3    take my advice that I gave to you before I even knew who that

4    would be that the only person in the world that you can trust

5    is your attorney.  The only person you can talk to without

6    running the danger that you're going to hear it from the

7    witness stand over there is your attorney.  So if there's any

8    question that you have about where things are going to go from

9    here -- and I would warn you that the road is a long and

10   arduous one -- if there's any question about how things are

11   going to go from here, please talk to your attorney first.

12        All right.  We're in recess; thanks to everybody.

13        MS. SHEEHAN-BALCHON:  Thank you, Your Honor.

14        MR. MAKNOON:  Thank you, Your Honor.

15     (Hearing concluded at four o'clock p.m.)

16              C E R T I F I C A T E

17   I, Shirley Ann Hall, certify that the foregoing is a correct

18   transcript for the record of proceedings in the above-titled

19   matter.

20

21

22                        s/Shirley Ann Hall
                         Shirley Ann Hall, RDR, CRR
23                       Official Court Reporter

24

25